**James CAUSEY,**

v.

**George BALOG, et al.**

**Civil No. JFM–94–485.**

United States District Court,
D. Maryland.

June 17, 1996.

902

Mercedes C. Samborsky, Joppatowne, MD, for plaintiff.

Richard G. Greene, James S. Ruckle, Jr., Assistant Solicitor, Department of Law, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff James Causey, a former transportation official for the City of Baltimore, sues the Mayor and City Council as well as a number of individual defendants for age and race discrimination. Plaintiff alleges that he was not promoted, harassed and eventually terminated from his job because he is an older white male in an administration dominated by younger black men. He asserts claims for (1) violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (ADEA); (2) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (3) violations of 42 U.S.C. §§ 1981, 1983 and 1985; and (4) state law defamation. Defendants maintain that Causey simply became caught in a series of efforts to downsize Baltimore's municipal bureaucracy and that his age and race were not considered. Defendants move for summary judgment.

I.

Causey is a white male born in January 1933. After over a decade as an engineer in the private sector, Causey joined the municipal government as a deputy transit commissioner in 1981. By 1987, Causey headed a division within the Department of Transportation (DOT). By all accounts he was a highly effective municipal executive.

In December 1988, newly elected Mayor Kurt Schmoke appointed Causey as the Acting Commissioner of DOT. Five months later, in May 1989, Mayor Schmoke appointed Herman Williams, a younger black man, as the permanent Commissioner of DOT and named Causey as the Deputy Commissioner I of DOT. Causey alleges that Williams subjected him to ongoing harassment—including public and private verbal abuse, threatened termination and disrespectful treatment—until May 1992, when Williams left DOT to become Chief of the Baltimore Fire Department. After Williams' departure from DOT, Causey requested that he be named Commissioner. Mayor Schmoke instead named Victor Bonaparte, a younger black man, Acting Commissioner.

On October 27, 1992, the City Council consolidated Baltimore's municipal bureaucracy by eliminating DOT—including plaintiff's job as Deputy Commissioner I—and transferring responsibility for city transportation to the Department of Public Works (DPW). DPW's newly created Bureau of Transportation (BOT) was divided into three divisions: Highways, Parking and Traffic. Although he sought the job of Chief of BOT, Causey instead was named Acting Chief of the Traffic Division and became Chief of the Traffic Division on December 28, 1992, a position that paid $6000 less annually than his previous position as DOT Deputy Commissioner I. David Montgomery, a black male in his late thirties, was named Chief of BOT. Causey alleges that no other former DOT executive was forced to take a salary cut after the department was abolished, and he claims that the city did not fairly consider him for the job of BOT Chief. He filed race and age discrimination charges with the EEOC on October 28, 1992.

Causey alleges that his situation worsened after he filed charges with the EEOC. He claims that Montgomery, his new supervisor, harassed him by undercutting his authority, denying him access to information, imposing unreasonable deadlines and by requiring him to use personal leave days to attend off-site meetings. He states that Montgomery followed an open door policy with black employees but required Causey to schedule appointments. In March 1993, Causey filed a second complaint with the EEOC alleging harassment in retaliation for his October 1992 EEOC filing.

On November 5, 1993, Montgomery and George Balog, the Director of DPW, informed Causey that his job as Chief of the Traffic Division was being eliminated because of funding shortfalls and that he would be laid off. On January 10, 1994, Causey was informed that he would be terminated as of February 11, 1994. On January 15, 1994, Causey amended his second EEOC complaint to include this termination as part of the alleged pattern of retaliatory discrimination.

Causey finally claims that Montgomery and Keith Scroggins, DPW's Personnel Director, wrongfully accused him of failing to return municipal property after leaving BOT. Plaintiff alleges that his office was not secured after he suffered from heart problems on January 10, 1994 and could not return to work. Causey alleges that Montgomery instead allowed other employees to remove property, including a computer and camera, from his office. Plaintiff claims that Montgomery and Scroggins accused him of theft and publicized this allegation to his coworkers and other municipal personnel.

## II.

The ADEA and Title VII make it unlawful for employers to discriminate against employees on the basis of age or race. Defendants argue that the individual defendants in this action are not "employers" under either of these statutes and therefore cannot be liable under Causey's first two counts.

## A.

In *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994), the Fourth Circuit held that an individual supervisory employee was not liable as an "employer" under the ADEA. The ADEA defines an employer as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year" including "any agent of such a person." 29 U.S.C. § 630(b). Some courts have relied on this language to find supervisory employees individually liable as "agents" of their employers. *See, e.g., House v. Cannon Mills Co.,* 713 F.Supp. 159, 160–62 (M.D.N.C.1988).

The *Birkbeck* court rejected this interpretation of § 630(b). The ADEA imposes liability only on employers with 20 or more workers, indicating an intent by Congress to place small entities beyond the scope of ADEA liability. "Given this evident limitation, it would be incongruous to hold that the ADEA does not apply to the owner of a business employing, for example, ten people, but that it does apply with full force to a person who supervises the same number of workers in a company employing twenty or more." *Id.* at 510 (citing *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.1993) ("If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees."), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994)). The court accordingly interpreted § 630(b)'s inclusion of "agents" in the definition of "employer" as nothing more than as an acknowledgement that respondeat superior liability applies under the ADEA. *See* 30 F.3d at 510 (noting that "[e]mployer liability ensures that no employee can violate the civil rights laws with impunity"). *Birkbeck* thus bars Causey's ADEA claims against the individual defendants named in the complaint.

## B.

As a further matter, moreover, it seems apparent that the logical force of *Birkbeck*'s

holding—that Congress did not intend to impose on individual employees the heavy burden of exposure to federal statutory liability—should preclude individual liability under Title VII as well. The two statutes raise identical concerns related to the proper scope of liability. Moreover, Title VII employs virtually the identical definition of "employer" as that in the ADEA, *see* 42 U.S.C. § 2000e(b) (defining "employer" as "a person . . . who has fifteen or more employees . . . and any agent of such a person"), and the *Birkbeck* court itself described Title VII as "the ADEA's closest statutory kin." 30 F.3d at 510. In short, according to the Fourth Circuit's analysis in *Birkbeck*, I would find that individual supervisors cannot be liable under Title VII.

■ Under Fourth Circuit case law, however, the question of individual liability under Title VII remains unsettled. The Fourth Circuit has not expressly extended *Birkbeck* to Title VII cases, and prior to *Birkbeck* the Fourth Circuit was one of a minority of circuits that allowed individual liability under Title VII.[1] *See Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990). Indeed, in *Birkbeck* the Fourth Circuit declined to break expressly with *Paroline*. Citing *Paroline*, the *Birkbeck* court stated in

footnote 1 that "[a]n employee, however, may not be shielded as an employer's agent in all circumstances. We address here only personnel decisions of a plainly delegable character." 30 F.3d at 510 n. 1. In *Paroline*, the court had allowed individual liability under Title VII against a supervisor who sexually harassed another employee by repeatedly making unwanted advances. Such sexual harassment clearly is not an activity that an employer could or would "delegate" to a supervisor. Although the meaning of *Birkbeck*'s footnote 1 is not entirely clear, I read it as indicating that, at most, an individual employee can be held liable for actions outside the scope of the duties delegated to him by his employer.[2]

■ In this case, however, plaintiff squarely alleges that the individual defendants acted within the scope of the duties delegated to them by the city. Plaintiff claims that various individual defendants helped carry out the Schmoke administration's systematic policy of discriminating against older white employees, a pattern that culminated in his firing. By plaintiff's own account therefore the individual defendants' allegedly discriminatory actions were of a "plainly delegable character." Thus, under *Birkbeck* his Title VII claims against these defendants fail.[3]

1. Recent decisions from other circuits, however, conclude that individual supervisors cannot be liable under Title VII. *E.g.*, *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995); *Greenlaw v. Garrett*, 59 F.3d 994, 1001 (9th Cir.1995); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1280–82 (7th Cir.1995).

2. Although at first glance a coherent way to reconcile *Paroline* and *Birkbeck*, this "delegated duties" rule fails to satisfy the underlying logic of *Birkbeck*. The ADEA and Title VII impose liability on "employers" and their agents. If Congress crafted the scope of liability under these statutes in order to limit the burden placed on small entities, as *Birkbeck* holds, I do not see how an individual supervisor, generally shielded from "employer" liability, suddenly can be held personally liable when he acts *outside* the scope of his employment-related duties. *Birkbeck* does not interpret the ADEA as indicating that Congress intended to burden only those small entities or individuals engaging in discrimination of a particularly personal, egregious, or extracurricular character; *Birkbeck* says that Congress did not intend to burden small entities.

Instead, the *Birkbeck/Paroline* balancing attempted in footnote 1 of *Birkbeck* seems to reflect concern for preserving a remedy for plaintiffs like Elizabeth Paroline who are subjected to discriminatory treatment as the result of supervisors abusing their power, rather than as the result of supervisors carrying out corporate policies. Liability for employment discrimination is a statutory creation, however, and Congress is free to impose liability on supervisors like the one who harassed Paroline. Until Congress does so, *Birkbeck* seems to command that, because "[e]mployer liability ensures that no employee can violate the civil rights laws with impunity," *Birkbeck*, 30 F.3d at 510, individual employees should not be liable under the ADEA or Title VII under any circumstances. *But see Shoemaker v. Metro Info. Servs.*, 910 F.Supp. 259, 266 (E.D.Va.1996) (rejecting view that supervisory employees should be unconditionally released from liability because such rule would "eviscerate Title VII's antidiscriminatory force").

3. Plaintiff's ADEA and Title VII claims against the individual defendants fail for the additional reason that he did not name them as respondents

## III.

 I next consider plaintiff's ADEA and Title VII claims against the City. Congress has determined that, where possible, employment discrimination disputes should be resolved through voluntary compliance and settlement. A plaintiff therefore must file an administrative charge with the EEOC and exhaust that agency's investigation and conciliation processes before bringing suit under the ADEA or Title VII. This framework imposes several requirements that bear on Causey's statutory claims against the City of Baltimore. First, a plaintiff must file charges with the EEOC within at most 300 days of an alleged act of age or race discrimination.[4] *See* 29 U.S.C. § 626(d)(1), (2); 42 U.S.C. § 2000e–5(e)(1). Second, in the event conciliation efforts fail, a plaintiff must file suit within 90 days of receiving a right to sue determination. *See* 29 U.S.C. § 626(e); 42 U.S.C. § 2000e–5(f)(1). Third, a plaintiff may only raise claims that are "reasonably related" to allegations contained in the EEOC charge, a standard that the Fourth Circuit has defined as encompassing claims that could reasonably be expected to follow from an administrative investigation of the original charge. *See Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981); *see also Doyle v. Sentry Ins.*, 877 F.Supp. 1002, 1007 (E.D.Va.1995).

Causey alleges three acts of discrimination: (1) his failure to be named Commissioner of DOT in 1989; (2) his transfer to the Traffic Division of DPW's Bureau of Transportation after the elimination of DOT in 1992; and (3) the termination of his employment in February 1994. He also alleges a sustained pattern of harassment during the periods of employment separating these events. He filed two separate EEOC charges. The first, # 120930139, was filed on October 28, 1992, charging age and race discrimination in his transfer from DOT to DPW; the EEOC dismissed this complaint and granted him the right to sue on November 30, 1993. *See* Defs.' Exs. 1, 2. The second charge, # 120930956, was filed in March 1993 and amended in January 1994, charging harassment and termination in retaliation for his first EEOC complaint; the Department of Justice granted Causey the right to sue on July 27, 1994.[5] Plaintiff filed this action on February 28, 1994.

### A.

 Plaintiff's first set of allegations center around the appointment of Herman Williams as Commissioner of DOT in 1989. Plaintiff claims that Williams was much less qualified and received the job only because he was younger and black. Causey also alleges that Williams subjected him to a pattern of harassment that ultimately caused plaintiff to suffer a heart attack in June 1989. Causey's first EEOC complaint, however, was not filed until the end of October, 1992. At most this charge would have applied to acts going back 300 days, or until approximately the beginning of 1992. While it is true that Williams remained Causey's supervisor until May of 1992, plaintiff's October

---

in his administrative charges. *See, e.g., Borowski v. Vitro Corp.* 634 F.Supp. 252, 255 n. 2 (D.Md. 1986), *rev'd on other grounds*, 829 F.2d 1119 (1987).

4. Although the baseline period is only 180 days, the statutes provide 300 days if the alleged act occurred in a state in which a state or local agency has authority to grant relief from the challenged practice and the plaintiff has instituted proceedings before that agency. Maryland's Commission on Human Relations has such authority, and Causey alleges in his complaint that he filed charges with that agency in October 1992. The record is silent with respect to any subsequent filings with Maryland authorities. However, I need not determine whether the proper period is 180 or 300 days. The 1989 events Causey recounts occurred well before the

300–day period preceding his first EEOC filing, whereas events from 1992 to 1994 were followed by EEOC filings well within a 180–day period.

5. Although the record is not explicit, I assume that the EEOC, instead of dismissing the second charge as it had dismissed the first one, referred Causey's complaint to the Justice Department pursuant to 42 U.S.C. § 2000e–5(f)(1) (requiring that EEOC, instead of directly initiating litigation as it would against a non-governmental respondent, refer to the Attorney General charges against governmental respondents that the EEOC chooses not to dismiss). Causey, however, requested that he be granted the right to sue before DOJ had taken action. Because the statutorily imposed 180 day deadline had passed, Causey's request was granted. *See* Defs.' Ex. 8.

1992 EEOC charge very specifically alleged discrimination only with regard to his transfer to DPW and could not reasonably be read as encompassing a pattern of continuing harassment at DOT that lasted from 1989 until 1992. Therefore, any claims related to the promotion of Herman Williams, instead of plaintiff, as Commissioner of DOT in 1989, as well any claims of harassment allegedly suffered by Causey prior to October 1992, are beyond the authorized scope of this suit.

### B.

Causey's second set of allegations relate to his involuntary transfer from DOT to DPW's Bureau of Transportation in October 1992. Causey immediately filed an EEOC charge, participated in the administrative process, received a right to sue notice and filed suit in timely fashion. Defendants accordingly do not challenge the propriety of Causey's assertion of these claims.

### C.

Causey's third set of allegations relate to his termination from his job as Traffic Chief of DPW's Bureau of Transportation. Although Causey's termination did not become effective until February 1994, the director of DPW advised Causey in November 1993 that he would be laid off. Defendants argue that these claims should be barred because "Causey failed to file an EEOC charge ... when his job was abolished in February, 1994." Defs.' Mot. for Summ.J. at 21. In a separate section of their brief, defendants discuss the merits of this charge but maintain that Causey chose never to file suit based on it. *See* Defs.' Mot. for Summ.J. at 5.

I find defendants' contention that Causey never filed EEOC charges related to his termination from DPW to be somewhat confusing in light of the documentary evidence they provide. The record indicates that Causey amended his second EEOC charge in January 1994 to claim that, in retaliation for his October 1992 EEOC complaint, "[o]n November 5, 1993, I was told that there was to be another re-organization, and that by the end of 1993, there would be no place for me in Public Works." Defs.' Ex. 9. Also, while it is true that Causey did not file a separate

suit under his second charge, he clearly includes allegations made in that charge in this suit. I therefore assume that defendants are raising two issues: (1) that this Court lacks jurisdiction over Causey's claims related to his second EEOC charge because he filed this suit before receiving notification of his right to sue under that charge; and (2) that Causey's claim that he was terminated from DPW in 1994 because of age and race discrimination is an impermissible enlargement of the scope of an EEOC charge that alleged only retaliatory harassment and discharge based on his first EEOC filing.

■ Defendants are correct as a general matter that a right to sue notice is a prerequisite to filing suit. The Fourth Circuit has held, however, that "entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, ... is [the] prerequisite to the jurisdiction of the federal courts." *Perdue v. Roy Stone Transfer Corp.,* 690 F.2d 1091, 1093 (4th Cir.1982). Causey clearly is now entitled to a right to sue notice: the Department of Justice granted him one on July 27, 1994. Although Causey initially filed claims related to his second EEOC charge too soon (and defendants accordingly could have moved to dismiss these claims at any time from February 28, 1994, when this suit was filed, until July 1994), "[h]ere ... the proper time has arrived for the plaintiff is entitled to, and has in fact received, a 'right to sue' notice." *Soble v. University of Md.,* 572 F.Supp. 1509, 1517 (D.Md.1983) (retaining jurisdiction over claim in analogous factual setting).

■ Defendants also suggest that Causey should be limited to a claim that his termination in 1994 was in retaliation for his previous EEOC filing and that he should not be permitted to advance separate theories of age and race discrimination. Causey's second EEOC charge, as filed on March 7, 1993 and amended on January 15, 1994, literally alleges only retaliation. *See* Defs.' Ex. 9. However, Causey's claims of age and race discrimination are "reasonably related" to Causey's claim of retaliation. Any investigation of a charge that an employee was retaliated against for filing a previous charge of discrimination would reasonably encompass

any further discrimination in addition to purely retaliatory acts; indeed, it is difficult to draw a practical distinction between these two conceptually different motives for taking adverse action against an employee. There can be no question that the City was placed on notice that Causey was alleging that he was unfairly harassed and ultimately fired. Accordingly, I find that Causey's claims for retaliation, age and race discrimination related to his employment at and termination from DPW's Bureau of Transportation are cognizable in this action.

### IV.

Having found that plaintiff is entitled to advance his claims against the City for age discrimination, race discrimination and retaliation based on (1) his October 1992 transfer from DOT to DPW's Bureau of Transportation; (2) harassment allegedly suffered during his tenure at DPW; and (3) his 1994 termination from DPW. I now consider whether plaintiff is entitled to proceed to trial on these claims.

■ Defendants argue that Causey has failed to make the evidentiary showing required of plaintiffs in discrimination cases as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). The *McDonnell Douglas* three-part test applies to age and race discrimination claims, including Causey's claim of reverse discrimination. *E.g., Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274–75 (4th Cir.1995) (ADEA); *Lucas v. Dole*, 835 F.2d 532, 533–34 (4th Cir.1987) (reverse discrimination). Under this test, plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Plaintiff establishes a presumption of discrimination by making such a showing. The burden then shifts to the employer to provide a nondiscriminatory reason for the adverse employment action. Once the employer meets that burden, the presumption of discrimination is dissolved and the burden shifts back to the plaintiff to show that the proffered reason is but a pretext for discrimination. 411 U.S. at 802–05.

■ Summary judgment analysis in employment discrimination cases follows these three stages. First, although entitled to all reasonable inferences as the non-movant, in response to a defendant's motion for summary judgment, a plaintiff has the burden of pointing to facts establishing his prima facie case. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir.1993). In response, the defendant's burden to offer a nondiscriminatory reason is one only of production, not persuasion. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). At the third and final stage, standard summary judgment principles apply: the plaintiff must present facts upon which a reasonable factfinder could conclude, based on a preponderance of the evidence, *see Henson*, 61 F.3d at 275, that the defendant's stated justification represents but a pretext for discrimination against the plaintiff. *See Mitchell*, 12 F.3d at 1315. I analyze below each of Causey's remaining ADEA and Title VII claims under this three-part framework.

### A.

■ Causey first claims age and race discrimination based on the loss of his job as DOT Commissioner I in October 1992. He has presented no evidence to substantiate that claim. Rather, the record establishes without contradiction that the entire Department of Transportation was eliminated by order of the City Council.

Causey next claims that, even if his termination from DOT was not discriminatory, his transfer to DPW at a reduction of authority and in pay was. Causey argues that under the provisions of the Baltimore City Charter he should have received a lateral transfer to Chief of DPW's Bureau of Transportation, the job he claims was most similar to his position as DOT Commissioner I. Instead, David Montgomery, a younger black man, received that position, and Causey was named to be one of Montgomery's direct subordinates as Chief of the Traffic Division, a position of more narrow scope than his previous job and that paid $6000 less per year. I construe plaintiff's allegations on

this point as a claim for discriminatory failure to promote.

▮▮▮▮ To establish his prima facie case for failure to promote, Causey must show that: (1) he is a member of a protected group; (2) he sought the position in question; (3) he was qualified; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir.1995). Causey indisputably has shown the first three elements. With regard to the fourth element, plaintiff has carried his initial burden by showing that Montgomery, the person selected for the job Causey sought, was younger and of a different racial group. *See O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (age); *Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989) (race). Plaintiff therefore has established a prima facie case of age and race discrimination based on his failure to be promoted to the job of Chief of DPW's Bureau of Transportation.

▮▮▮▮ Moving to the second phase of analysis under *McDonnell Douglas*, I next consider whether defendants have met their burden of offering a nondiscriminatory reason why Montgomery was named to head BOT instead of plaintiff. They have. Defendants claim that Montgomery was moved to the position because of his greater administrative experience within DPW. This meets their burden of production for summary judgment purposes. *See Hicks*, 509 U.S. at 506–08, 113 S.Ct. at 2747.

▮▮▮▮ The burden therefore shifts back to plaintiff to point to specific facts indicating that this stated justification represents but a pretext for discrimination. According to findings made by the EEOC that are part of the record, a total of six former DOT managers were given the option of being laid off or accepting a position within DPW's new transportation bureau. Plaintiff argues that he alone did not receive a lateral transfer and only one other employee, also white, was transferred at a pay cut. Standing alone, these facts—while arguably suspicious—

prove nothing. *See Birkbeck*, 30 F.3d at 511 (noting that inference of discrimination cannot be based on statistical analysis of very small sample sizes). Causey offers no other evidence of pretext.

Instead, he emphasizes his own extensive qualifications, casts doubt on Montgomery's transportation-related experience, and offers conclusory allegations about the Schmoke administration's desire to weed out older white employees. These generalized allegations are insufficient as a matter of law. Although Causey presents an argument that he was the better candidate, courts are not to impose their own judgments for nondiscriminatory employer decisions. Absent a factual showing by plaintiff sufficient to raise an inference of pretext, the City is free to name an experienced DPW official to head the new transportation department instead of another employee with superior transportation qualifications. *See Holmes v. Bevilacqua*, 794 F.2d 142, 147–48 (4th Cir.1986) (noting that municipal government experience can be valid reason for promoting nonmember of protected class over member).

### B.

▮▮▮▮ Plaintiff next claims that he was subjected to a sustained pattern of harassment after he was transferred to DPW's Bureau of Transportation. Causey's allegations of harassment are long on conclusory allegations but entirely short on facts and specifics. He details several episodes of harassment involving Montgomery and Williams in his complaint. *See, e.g.*, Compl. at 15–21. As described by another circuit, however, on defendants' motion for summary judgment, "the mere allegations in the complaint are not sufficient; the non-movant is required to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence supported their claim." *Conti-Commodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996); *see also Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). This plaintiff has entirely failed to do.

## C.

Causey finally claims that his termination as Chief of the Traffic Division in February 1994 was discriminatory. The elements of a prima facie case for discriminatory discharge are: (1) that plaintiff is a member of a protected group; (2) that he was qualified for the job and performed the job satisfactorily; (3) that he was discharged; and (4) the job remained open to similarly qualified applicants after he was fired. *Carter v. Ball*, 33 F.3d 450, 458–59 (4th Cir. 1994). Defendants do not contest that Causey has established the first three prongs of his prima facie case. Causey also must make a fourth showing: that the position in question remained open after he was rejected. As described by the Fourth Circuit in a related context, "[t]he proof of the first three prongs of the scheme only set the stage for the fourth, which tips the scale in favor of a prima facie case, because the fourth prong requires proof that points toward illegal discrimination." *Holmes*, 794 F.2d at 147 (emphasis omitted). In short, Causey must raise a presumption that he was laid off *because* of his age or race, not simply that he was a qualified, older white employee who suffered adverse employment action.

First, considering the fourth prong as a literal requirement, Causey has failed to make this showing. Simply put, the record does not indicate that Causey was fired and replaced by someone who was younger and/or black, or that the City sought other

applicants for the job of Chief of the Traffic Division. Instead, his job as Chief of the Traffic Division was eliminated for "lack of funding." [6] *See* Defs.' Ex. 7. Because Causey has not shown that the City continued to take applications from other applicants, he cannot establish the fourth prong of his prima facie case.

It is clear, however, that *McDonnell Douglas* represents a conceptual approach to indirectly proving discrimination, not a set of rigid rules. *See* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Causey has difficulty establishing the classic prima facie case because, rather than being fired in favor of a younger black employee, he claims that he was discriminatorily targeted to bear the impact of the City's efforts to downsize and to promote younger black men. Under Fourth Circuit law, in the reduction-in-force context, a plaintiff may establish his prima facie case by pointing to "some other evidence" that an employer did not act neutrally with respect to age or race. *E.g., Blistein v. St. John's College*, 74 F.3d 1459, 1470 (4th Cir.1996). The inquiry thus becomes whether Causey has produced such evidence in this case.[7]

Defendants' exhibits indicate that a total of six management employees were laid off from DPW for "lack of funding" early in 1994. *See* Defs.' Ex. 7. All were over forty, and five of the six were white. As mentioned above, the Fourth Circuit has held it improp-

---

6. Plaintiff responds that the City's "Roster of Employees" currently lists Causey's old job as Chief of the Traffic Division as an unfilled, still-budgeted vacancy. *See* Pl.'s Ex. 3, 4. Standing alone, however, an entry on a municipal employment roster is insufficient to prove that Causey's position "remains open." Plaintiff offers no evidence that the City has interviewed other applicants or otherwise sought to fill the position. Showing that the City terminated him and then sought younger black candidates would be sufficient to raise such an inference. Without other evidence, however, plaintiff's reference to the municipal employment roster fails to "tip the scale" toward an inference of discrimination.

7. Although I am primarily analyzing the evidence from the perspective of whether Causey has made out a prima facia case under the first stage of the *McDonnell Douglas* scheme of proof, it is clear that defendants have articulated a non-discriminatory reason for the action that plaintiff

challenges: they contend that Causey's job as Chief of the Traffic Division was terminated because of funding shortfalls. They have therefore carried their burden of production under the second stage of the *McDonnell Douglas* scheme of proof, shifting the responsibility to Causey to attack these justifications as pretextual. Accordingly, the current "some other evidence" inquiry may be equally considered from the perspective of whether Causey has established facts from which a reasonable factfinder could conclude that defendants' proffered reason is pretextual, in accordance with the third stage of the *McDonnell Douglas* scheme of proof. Thus, just as I conclude above that an entry on the City's employment roster is insufficient to establish that plaintiff's position "remained open," *see supra* note 6, I alternatively find that it is insufficient to present a triable issue of fact as to whether the City's proffered reason is pretextual.

er to rely on statistical evidence of this nature involving small numbers of terminated employees; although five of the six DPW managers laid off were white, this number is too small to reliably support an inference of discrimination. *See Birkbeck*, 30 F.3d at 511.

■ Causey has failed to identify any other specific evidence supporting his claims of intentional discrimination. He offers instead only the conclusory allegation that "the City and its management employees who supervised plaintiff created a workplace characterized by abusive conduct against the plaintiff, interference with his projects, demeaning him to his subordinates and in the presence of City residents whom he was assisting; and, finally, in February of 1994, advising him that he was terminated forever from City employment." Pl.'s Opp'n at 8. Claims of discrimination, however, cannot be supported by general allegations. *See Carter*, 33 F.3d at 461–62. Causey seems to believe that he can meet his burden of proof merely by establishing his status as an older, white civil servant who has been abruptly pushed aside by a new municipal administration dominated by younger black men. He has critically erred in underestimating his task. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir.1987) ("[C]ausation must be shown by probability rather than mere possibility.").

■ Plaintiff's final argument is that he was fired in retaliation for his October 1992 EEOC filing. A prima facie case for retaliatory discharge consists of showing (1) that the plaintiff engaged in a protected activity, such as filing an EEOC charge; (2) adverse employment action; and (3) a causal connection between the protected activity and the adverse action. *Carter*, 33 F.3d at 460. Defendants concede the first two prongs but argue that plaintiff has produced no evidence of causation.

Courts have found that temporal proximity between the activity and the adverse action may constitute evidence of causation. *Id.*

In this case, however, over a year passed between Causey's October 1992 EEOC charge and his notification in November 1993 that he would be laid off from DPW. Although plaintiff claims that harassment began immediately after his complaint, he points to no specific evidence linking his EEOC charge with his allegations of harassment. In particular, Causey points to no facts indicating that David Montgomery, the focus of his claims of harassment, even knew about the October 1992 EEOC charge. Montgomery was not named in that charge, was not involved in the decision to eliminate DOT or transfer Causey to DPW, and Causey offers no evidence that Montgomery was part of the EEOC investigation of that charge. Plaintiff again simply has failed to produce facts to support any reasonable inference of causation.

V.

Plaintiff's next set of claims allege violations of various federal civil rights statutes. Defendants argue that these claims are preempted by the comprehensive remedial schemes of the ADEA and Title VII.

A.

■ Defendants are correct that Causey cannot bring a claim under § 1983 for his claims of age discrimination. In *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364 (4th Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989), the Fourth Circuit held that the ADEA's comprehensive remedial scheme precludes individuals from independently pursuing age discrimination claims outside the ADEA's remedial structure. In particular, *Zombro* bars not only the use of § 1983 to assert violations of the ADEA itself, but also prevents age discrimination plaintiffs from bringing § 1983 claims for violations of the Fourteenth Amendment. *Id.* at 1368–71. Causey's § 1983 and § 1985(3) [8] claims must therefore be dis-

---

8. Although there apparently is no Fourth Circuit case directly on point, it seems clear that *Zombro* bars § 1985(3) suits as well. Sections 1983 and 1985(3) are largely analogous, with § 1985(3) providing a remedy against those who conspire

to deny a plaintiff equal treatment under law. The breadth of the *Zombro* analysis, moreover, clearly indicates that a plaintiff is just as unable to circumvent the ADEA by using § 1985(3) as he is unable to do so using § 1983. *See also infra*

missed to the extent they allege violations of statutory or constitutional rights to be free from age discrimination in employment.

### B.

■ Likewise, in *Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Court held that § 1985(3) cannot be used to assert violations of Title VII. Title VII's remedial scheme of requiring plaintiffs to file EEOC charges and to participate in the administrative conciliation process indicates a congressional intent to encourage voluntary settlement of employment discrimination claims. Allowing violations of the rights provided by Title VII to be asserted through the vehicle of § 1985(3) would effectively allow plaintiffs to circumvent this remedial scheme. The *Novotny* Court therefore reasoned that Title VII provides the exclusive remedy for the rights it creates. *Id.* at 375–78, 99 S.Ct. at 2350–52.

■ *Novotny* dealt only with § 1985(3), not § 1983. Courts have recognized, however, that the two statutes are analogous. *See Zombro,* 868 F.2d at 1367 (describing § 1985(3) as "the conspiracy counterpart of § 1983"). *Novotny*'s holding, moreover, is a broad statement of the importance of requiring plaintiffs seeking to vindicate rights created by Title VII to operate within the statute's remedial scheme. Accordingly, although the Fourth Circuit has not yet had the occasion to do so, other circuits have taken the obvious step of applying *Novotny* to hold that a plaintiff cannot assert violations of Title VII through § 1983. *See, e.g., Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 982 (10th Cir.1991); *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984); *Irby v. Sullivan,* 737 F.2d 1418, 1429 (5th Cir.1984); *see also McCauley v. Greensboro City Bd. of Educ.,* 714 F.Supp. 146, 150 (M.D.N.C.1987).

It is equally clear, however, that Title VII does not preclude the assertion of § 1983 claims based on *other* statutory and constitutional provisions. In other words, although a plaintiff cannot directly circumvent Title VII's remedial scheme by predicating a § 1983 action on the rights created by Title VII, courts consistently have held that Congress did not intend by creating Title VII to preclude preexisting avenues of redress for employment discrimination, such as § 1983 suits for Fourteenth Amendment violations. *See Beardsley v. Webb,* 30 F.3d 524, 527 (4th Cir.1994); *Keller v. Prince George's County,* 827 F.2d 952, 956 (4th Cir.1987). Causey therefore can assert claims under § 1983 and § 1985(3) for violation of his Fourteenth Amendment right to be free from race-based discrimination in public employment. Similarly, it is clear that Causey's suit under § 1981 is not precluded. *See Keller,* 827 F.2d at 956. Finally, Causey also seems to raise a due process argument as a separate challenge to his transfer to and eventual termination from DPW's Bureau of Transportation. I next consider whether plaintiff is entitled to proceed to trial on these claims.

### VI.

#### A.

■ Causey's § 1983 claim that he was harassed and terminated in violation of his Fourteenth Amendment right to equal protection, as well as his § 1981 claim that he was denied the right to perform his employment contract on equal terms with black employees, are based on the same allegations as his Title VII claims. The Fourth Circuit has noted that the *McDonnell Douglas* burden-shifting scheme of proof used in Title VII cases also applies to similar litigation under §1983 or § 1981. *See Beardsley,* 30 F.3d at 529; *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.,* 753 F.2d 1281, 1285 (4th Cir.1985). Plaintiff's above-discussed failure to establish a prima facie case under Title VII therefore is fatal to his claims under §§ 1981, 1983 and 1985(3).

#### B.

Although Causey also seems to assert violations of his procedural rights, it is not clear

discussion of *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

whether he is in fact claiming violation of his right to Fourteenth Amendment procedural due process or simply that the City failed to comply with civil service rules. If the former, even assuming that Causey had a property interest in continued employment, he is not entitled to a pretermination hearing if his job is eliminated pursuant to a nonpretextual plan of governmental reorganization or downsizing. *See Digiacinto v. Harford County*, 818 F.Supp. 903, 905–06 (D.Md. 1993). *See generally Mandel v. Allen*, 81 F.3d 478, 480–82 (4th Cir.1996) (discussing scope of due process protection afforded state employees). As discussed, nothing in the record indicates that either the 1992 elimination of DOT or the 1994 funding shortfall at DPW was pretextual. In any event, Causey at no point seems to be seeking such a hearing or even alleging a constitutional due process issue.

Instead, what Causey alleges in the complaint is that he "was deprived the procedural rights afforded to others in applying for competitive civil service jobs in that he was told, when he applied, that the positions were not competitive, after written announcements had been circulated that the positions were competitive." Compl. at 32. He supports this claim with several averments that George Balog and David Montgomery privately informed him that the civil service rules would not apply in his case. If Causey had produced evidence that these rules were applied to other employees, such allegations may have been relevant to his underlying discrimination claims. He has not, however, done so.[9]

## VII.

■ Causey's final claim is for defamation under Maryland law. The claim arises from an episode that occurred after plaintiff had been terminated. Causey alleges that on or around February 17, 1994, he was accused by David Montgomery and Keith Scroggins of stealing a laptop computer and camera owned by the city. He also claims

that these allegations were "published to plaintiff's co-workers and were noted in his personnel file to be published to any prospective employer." Compl. at 33–34.

Although officially terminated on February 11, 1994, Causey last went to work at DPW on January 10, 1994, the day he was notified of the date that he would be laid off. Causey states in his complaint that he asked Montgomery to secure his office in the interim but that Montgomery intentionally did not do so and that in fact "Mr. Montgomery ... permitted [other DPW employees] free access to plaintiff's office during his absence to remove his City equipment." Compl. at 25. Plaintiff further contends that, after allowing other employees to take equipment from his office, Montgomery publicized to others that Causey had misappropriated the equipment.

Defendants portray a different version of events. They maintain that the computer and camera turned up as missing during an inventory of Causey's equipment and that, in keeping with standard procedure, Montgomery and Scroggins sought to withhold Causey's final paycheck until the equipment could be located. Defs.' Mot. for Summ.J. at 26–27. Causey eventually received his last paycheck, and the computer and camera were never located.

■ Causey's prima facie case of defamation requires proof of the following: (1) that the defendant made the defamatory communication; (2) that the statement was false; (3) that the defendant was at fault—i.e., negligent or malicious—in making the statement; and (4) that the plaintiff suffered harm. *Bagwell v. Peninsula Regional Medical Ctr.*, 665 A.2d 297, 317 (Md.Ct.Spec.App.1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). As defendants point out, Causey does not identify any coworkers who allegedly learned of the theft charge from Montgomery or Scroggins (nor any who even knew of the allegation at all), nor does Causey provide any other documentation of the alleged "publicization" of the allegations.

---

9. Likewise, although Causey alleges in his complaint that "[t]he City supervisory personnel who directly supervised plaintiff also violated his First Amendment rights by prohibiting him, on threat of immediate firing, from talking to any members

of the public or the press concerning the acts of discrimination, herein described, which were occurring against the plaintiff and others," Compl. at 33, he has proffered no evidence to support that claim.

Causey also provides no evidence that Montgomery or Scroggins even accused him of theft; defendants maintain that they merely questioned him about the missing equipment, and Causey offers no contradictory evidence. In fact, his opposition to the present motion is entirely silent with regard to the defamation charge. Summary judgment would be appropriate on this basis alone.

Moreover, as defendants further argue, under Maryland law "[s]tatements made within the context of the employer-employee relationship in furtherance of a protection of the employer's property have long been accorded a qualified privilege." *Exxon Corp. v. Schoene,* 67 Md.App. 412, 508 A.2d 142, 147 (1986); *see also McDermott v. Hughley,* 317 Md. 12, 561 A.2d 1038, 1046 (1989). Causey must show "actual malice" in order to overcome this qualified privilege. Even assuming that Montgomery and Scroggins rushed to interrogate Causey regarding the missing equipment instead of conducting an investigation, that they thereby raised doubts about his integrity, and that they allowed this information to become known within DPW, Causey's claim for defamation therefore still fails. Maryland courts have noted that " 'actual malice' cannot be established merely by showing that . . . the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person." *Bagwell,* 665 A.2d at 318 (emphasis omitted). As with the rest of his allegations, Causey offers no specific proof of his claims that Montgomery permitted other employees to remove items or that Montgomery and Scroggins defamed him as further retaliation for his October 1992 EEOC complaint. Absent proof of malice, Causey's defamation claim fails as a matter of law.

A separate order granting defendants' motion for summary judgment and entering judgment on its behalf is being entered herewith.