**David OBI, Plaintiff**

v.

**ANNE ARUNDEL COUNTY, MD, Defendant**

**No. CIV AMD 00–112.**

United States District Court, D. Maryland.

May 1, 2001.

Frederick P Charleston, Law Office of Frederick P. Charleston, Baltimore, MD, for plaintiff.

William D. Evans, Jr., Assistant County Attorney, Annapolis, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, David Obi ("Obi"), is employed as a Utilities Engineer by Anne Arundel County at its Department of Public Works ("DPW"). He filed this case against the DPW and the County (hereinafter jointly "defendant" or "the County"), alleging discrimination based on race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). Obi also alleges a retaliation claim under Title VII. Obi's claims arise out of the County's failure to promote him to the position of Chemist.

Discovery has been concluded. Now pending is defendant's motion for summary judgment. The motion raises three fundamental issues: (1) whether plaintiff has established a *prima facie* case of discrimination under Title VII; if so, (2) whether plaintiff has marshaled sufficient evidence upon which a reasonable jury could find that defendant's failure to promote him was based on unlawful discrimination; and (3) whether plaintiff has marshaled sufficient evidence upon which a reasonable jury could find that defendant took adverse actions against him in retaliation for plaintiff's invocation of his rights under Title VII. No hearing is necessary. As explained herein, although I am satisfied that, contrary to defendant's contention, Obi has established a *prima facie* case of discrimination, I shall nonetheless grant the motion for summary judgment because no reasonable jury could find that he has been a victim of discrimination or retaliation.

## I. THE FACTS STATED IN THE LIGHT MOST FAVORABLE TO OBI

I shall set forth the facts in the light most favorable to Obi, the party opposing summary judgment. Obi is a native of Nigeria, West Africa. He became a United States citizen in 1987. He holds a B.S. degree in chemistry and an M.S. degree in chemical engineering. Prior to his em-

ployment with the County, he held positions in the chemical engineering field, some of which involved supervisory responsibilities.

The County hired Obi as a Utility Engineer I in November 1989. His supervisor, until her departure in June 1997, was Jackie Hampton ("Hampton"). Hampton was the coordinator of the County's Pretreatment Program and held the title of Chemist.[1] Obi assisted Hampton in managing the Pretreatment Program for seven years. Obi performed some of Hampton's duties when she was absent and from time-to-time he supervised other employees.[2] By all accounts, Obi's job performance was commendable. Obi is described "as a competent, good, and at times, outstanding Utilities Engineer I, entitling him thereby to regular yearly increases." Bonk Decl. ¶ 3.

Hampton left her position effective in June 1997. The County advertised the opening for the vacated Chemist position both externally and internally. The position announcement listed the qualifications as follows:

> Graduation from an accredited four-year college or university with major course work in chemistry or biology, and two (2)or more years experience in the field of water and wastewater chemistry, including supervisory experience and six (6) or more months experience in the instrumentation and environmental chemistry analysis, and possession of a

valid non-commercial class C motor vehicle operator's license issued by the State. Preference will be given to candidates who demonstrate knowledge of preparing Federal and State environmental regulatory reports and experience managing a Pretreatment Program including inspections, monitoring and enforcement activities.

Job Announcement, posted March 17, 1997, Def.'s Mot. for Summ. J., Ex. B. The personnel requisition listed as preferred skills the following traits: experience managing or working in a Pretreatment Program, coordinating inspections, monitoring, and enforcement activities and experience preparing federal and state environmental regulatory reports. Personnel Requisition, February 10, 1997, Def.'s Mot. for Summ. J., Ex. B.

Obi timely applied to fill the vacancy. He was optimistic about his chances, given his experience working in the Pretreatment Program for more than seven years and the DPW's avowed preference to fill higher-level openings by promotions from within the agency. Plaintiff would have become the first non-white to hold the position of Chemist if he had been selected.

The selection process consisted of two stages: a certification and an interview. A personnel officer was charged with certifying applicants as eligible for the position based upon the position description and

---

1. The Pretreatment Program is charged with monitoring and controlling industry's discharge of substances into the sewer and waste water systems of the County. The Pretreatment Program insures that industrial discharge is effected consistent with federal regulations; it issues permits consistent with those regulations.

2. Obi claims that in 1997, Hampton instructed him to supervise Daniel Marchetti, a grease trap inspector. He states that Chris-

tian Tait, who succeeded Hampton as Obi's supervisor, ended this supervision in 1999, but Obi continued to sign Marchetti's time sheets. In any event, Obi's Performance Evaluations, which contain a section permitting evaluation of supervision responsibilities, indicate that he was neither considered Marchetti's official supervisor nor to have any supervisory duties at all during Hampton's or Tait's tenure as his supervisor.

the applicant's qualifications and experience. Obi was among the five persons certified as qualified. At this stage, Obi was ranked number one with a score of 89; he outscored the second-ranked candidate by 28 points; he outscored the candidate who was ultimately selected, Christian Tait, by 34 points.

The certification ratings were used solely to qualify an applicant for an interview, which was the second stage of the selection process. The ratings were not factored into the selection process after the five candidates were certified by the personnel office. In the course of the interview, each candidate was asked the same 17 questions covering the following areas: (1)general experience; (2) laboratory experience; (3) pretreatment and environmental experience; (4) project management experience; and (5) administrative and personnel experience. Obi was the only non-white interviewed. Def.'s Answer to Interrog. 5.

The interview panel consisted of three people: Hampton, Obi's supervisor, whose retirement as Laboratory and Pretreatment Program Manager created the vacancy under consideration; Michael Bonk, Hampton's supervisor, who was the Deputy Director of Utility Operations for the DPW; and Paul Lesher, who was the Regional Manager, Wastewater, Northern Bureau of Utility Operations. Hampton, Bonk and Lesher are all white and all were born in the United States. As well as serving on the interviewing panel, Bonk was also the selecting official.

The interview scores awarded by each panelist to each candidate were averaged to arrive at a composite score for each candidate. The successful candidate, Christian Tait, a white male born in the United States, had the highest composite score, 52. Obi received the third highest composite score, 48. The scores given by each interviewer to the certified applicants were as follows:

| Applicant: | D. Obi | L. Ramallosa | B. George | C. Tait | J. Demsky |
|---|---|---|---|---|---|
| Interviewer | | | | | |
| M. Bonk | 46 | 21 | 52 | 52 | 21 |
| P. Lesher | 42 | 32 | 48 | 45 | 25 |
| J. Hampton | 55 | 24 | 51 | 58 | 22 |
| Total | 143 | 77 | 151 | 155 | 68 |
| Average | 48 | 26 | 50 | 52 | 23 |

Def.'s Rep. Mem., Ex. 6D.

Disappointed by his non-selection, Obi filed a timely charge of discrimination based on race and national origin with the Maryland Commission on Human Relations on August 7, 1997, which constituted a dual filing with the Equal Employment Opportunity Commission ("EEOC"). A final decision of no discrimination was issued on October 20, 1998, and reaffirmed upon reconsideration on May 28, 1999. On October 14, 1999, the EEOC issued Obi a right to sue letter. On March 20, 2000, Obi filed another complaint with the EEOC, alleging retaliation. On April 10, 2000, the EEOC, at Obi's request, issued him a Right to Sue letter on the retaliation claim.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. This burden "is particularly strong when that nonmoving party [also] bears the burden of proof." *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990). The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985); *see O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.

56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

## III. ANALYSIS

### A. Failure–to–Promote Claim

 Obi first contends that the County violated Title VII when it failed to promote him to the Chemist position. In order to prevail on a Title VII claim, a plaintiff must prove that "but for the employer's motive to discriminate against the employee because of the employee's [race or national origin], the employee would not have suffered the [adverse employment] action." *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993); *see Sailor v. Hubbell, Inc.,* 4 F.3d 323, 326 (4th Cir.1993). A plaintiff may prove his case in one of two ways. First, he may rely on direct evidence or indirect evidence of sufficient probative force to support an inference of discrimination. *Goldberg v. B. Green & Co., Inc.,* 836 F.2d 845, 847–48 (4th Cir.1988). Second, he may prove his case of intentional discrimination by using the burden-shifting proof scheme originally formulated for failure-to-hire cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Obi proceeds under the latter approach.

The *McDonnell Douglas* proof scheme places the initial burden of production on the plaintiff to make out a *prima facie* case of discrimination by establishing that: (1) he was a member of a protected group, i.e., a member of a particular racial group or discrete ethnic group having an identified national origin; (2) he applied for and was qualified for the job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir.1995); *see also Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999).

If plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(*citing Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because the employer's burden is one of production and not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (*quoting E.E.O.C. v. Western Electric Co. Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's race or national origin. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742.

The Supreme Court recently clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough … to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.* (*quoting Hicks*, 509 U.S. at 519, 113 S.Ct. 2742). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

The County does not challenge Obi's showing in respect to the first three elements of the *prima facie* case: he is an African–American male of Nigerian ancestry who was qualified for the Chemist position, but was not chosen to fill it. The County contends, however, that Obi is unable to establish a *prima facie* case of race or national origin discrimination because he has not satisfied the fourth element. That is, the County contends, Obi has failed to present evidence that his race or national origin was a factor considered by the County in not promoting him. *See Holmes v. Bevilacqua*, 794 F.2d 142, 147 (4th Cir.1986)(en banc).

The County correctly describes the reasoning of *Bevilacqua*. Nevertheless, it is clear that the Fourth Circuit's reasoning in *Bevilacqua* has been disavowed by that Court and, in any event, has been abrogated by a subsequent Supreme Court decision. Plainly, therefore, the *Bevilacqua* case has no application to failure-to-promote cases such as the case at bar.

In *Bevilacqua*, the Fourth Circuit adapted the *McDonnell Douglas* proof scheme for failure-to-promote cases in which the opening to which the plaintiff sought promotion was filled rather than left vacant. *Id.* at 146–47. The *Bevilacqua* Court reasoned that, as to the fourth element of a *prima facie* case, because "[l]eaving the job open is the element that justifies the presumption of racial discrimination and makes a prima facie case," the plaintiff "must present some other evidence that his race was a factor considered by his employer in not granting him the promotion. *There must be some evidence that race was a determining factor in the employer's decision.*" *Id.* at 147 (emphasis added). This reasoning has been fatally undermined in subsequent cases.

The Fourth Circuit signaled most clearly its abrogation of the *Bevilacqua* reasoning as to the elements of a *prima facie* case in *Blue v. United States Dept. of the Army*, 914 F.2d 525, 537 (4th Cir.1990).[3] In *Blue*, plaintiffs challenged the trial court's award of sanctions against them, in part, by arguing that, in light of *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the lower court had erred in applying the elements of a prima facie case articulated in *Bevilacqua*. *Id.* In *Patterson*, the Supreme Court had held that to establish a *prima facie* case for a failure-to-promote claim, plaintiff "need only prove by a preponderance of the evidence that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected respondent either continued to seek applicants for the position *or, as alleged here, filled the position with a white employee.*" *Patterson*, 491 U.S. at 186–87, 109 S.Ct. 2363 (emphasis added). Thus, although it upheld the award of sanctions, the Fourth Circuit stated that the *Blue* plaintiffs' argument concerning the invalidity of the *Bevilacqua* reasoning, in light of *Patterson*, "is certainly a correct one." *Blue*, 914 F.2d at 537.

Moreover, although the Supreme Court did not have occasion to announce explicitly its disapproval of the reasoning in *Bevilacqua* when it decided *Patterson*, the Court's language in that case left no doubt that this was so, *see Patterson*, 491 U.S. at 186–87, 109 S.Ct. 2363, and, of course, *Patterson* has been consistently followed by the Fourth Circuit in reported opinions.[4] Thus, to establish the fourth ele-

**3.** In *Blue*, the focus of the case was plaintiffs' appeal of the district court's imposition of sanctions for bringing frivolous actions under Title VII. *Bevilacqua*, and the statement of the *prima facie* case in failure-to-promote claims, are addressed in plaintiffs' argument that their claims were not frivolous because they established a prima facie case under the correct standard. It is in this context that the Fourth Circuit acknowledged the abrogation of *Bevilacqua*. The Court did not find, however, that this issue was dispositive of the validity of the trial court's award of sanctions. *Blue*, 914 F.2d at 537 ("Plaintiffs' statement of the law is certainly a correct one, but it does not permit us to overturn outright the district court's award of sanctions in this case.").

**4.** In two unpublished opinions in failure-to-promote cases, the Fourth Circuit appears to have applied the *Bevilacqua* reasoning and required that a plaintiff seeking to establish a *prima facie* case present evidence that race was a "determining factor" in the employer's decision. *See Mathew v. Virginia Union Univ.*, 958 F.2d 368, 1992 WL 58504 * 3 (4th Cir. March 27, 1992); *Devine v. Thalhimers*, 977 F.2d 572, 1992 WL 296350 *1 (4th Cir. October 16, 1992).

In addition, in *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir.1995), a discriminatory discharge case brought under the Americans with Disabilities Act, the Court applied reasoning similar to that presented in *Bevilacqua*. The Court stated that to establish a *prima facie* case, "the plaintiff must present some other affirmative evidence that disability was a determining factor in the employer's decision," referencing *Bevilacqua*. *Id.* It seems clear, however,

ment of the *prima facie* case, the Fourth Circuit has consistently held, the plaintiff must show he "was rejected under circumstances giving rise to an inference of unlawful discrimination." *See, e.g., McNairn v. Sullivan,* 929 F.2d 974, 977 (4th Cir. 1991); *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994); *Amirmokri,* 60 F.3d at 1129; *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959–60 (4th Cir. 1996); *Taylor,* 193 F.3d at 230; *accord E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 851 n. 2 (4th Cir.2001)("What is critical with respect to the fourth element [of the prima facie case] is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) 'under circumstances which give rise to an inference of discrimination.' ")(*quoting Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

■ Thus, while the parties in the case at bar have sparred over the application of the *Bevilacqua* reasoning to Obi's non-promotion, it is clear that I need not indulge their misdirection. It is plain that Obi has established the fourth element of his prima facie case: although (by a large margin) he was determined to be the best-qualified candidate after stage one of the selection process (involving objective measures of each candidate's fitness for the position of Chemist), when the County resorted to the admittedly subjective interview process at stage two, Obi, an internal candidate, was rated number three by an all-white, American-born panel of interviewers, who rated a white, American-born external candidate more favorably than they rated Obi. Thereafter, the selecting official (a member of the interview panel) chose for the position the white, American-

born, candidate, who scored slightly higher than Obi in the interview process. Manifestly, these are "circumstances which give rise to an inference of discrimination." *Sears Roebuck & Co.,* 243 F.3d at 851 n. 2.

I turn then, to the second step of the analysis. To meet its burden of production, the County simply must set forth a legitimate, nondiscriminatory reason for its selection of Tait and its non-selection of Obi. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. "The defendant need not persuade the court that it was actually motivated by the proffered reason." *Id.*

Defendant asserts that Tait was selected for the Chemist position because he was deemed the most highly-qualified candidate. The County argues that Tait's superior qualifications were particularly manifested during the interview: "Mr. Obi's failure to be promoted to Chemist was based on his performance at the oral interview as compared to other candidates." Def.'s Mot. for Summ. J. at 3. It states:

The County agrees that because of his background and knowledge of the program, Mr. Obi had the best advantage of the qualified candidates who were interviewed. However, during the interview process Mr. Obi failed to perform well in his responses to the questions. The questions were developed to solicit information from the candidates as to their vision, leadership, supervisory and management capabilities. Mr. Obi scored low on the following: preparation and justification of annual budgets to insure adequate funding for program success; personnel management and supervision and management of support personnel.

that the Court presents this modification as equivalent to, or simply an elaboration of, the requirement that it be shown at the *prima facie* case stage that the adverse employment action occurred "under circumstances that

raise a reasonable inference of unlawful discrimination," which the Court "hold[s]" to be the fourth prong of the *prima facie* case. *Id.* at 58.

In other areas, he did not fully explain or give examples of the kinds of experience necessary for the position.[5]

Inter–Office Correspondence from John M. Brusnighan, Director of DPW, to Adrian Wiseman, Human Relations Officer, May 22, 1997, Def.'s Mot. for Summ. J., Ex. E. In the County's view, Obi's interview performance wholly explains his failure to win promotion to the Chemist position.[6] The County further states that:

> the interview panel created a list of interview questions and ratings/scores associated with the answers provided to questions. Mr. Obi failed to do a thorough job of answering the questions in comparison to two other applicants who scored incrementally higher than Mr. Obi. Mr. Obi was given the opportunity to discuss his experience in writing permits, he failed to offer good feedback. He failed to adequately describe how he would manage subordinates or subordinate personnel issues or financial duties relating to the position. When given the opportunity to describe why we should select him for the position, he failed to convince the panel that he was confident, committed or self-motivated to handle the duties or make needed changes to advance the program.

The outside applicant, Christian Tait, exhibited better interview skills including well-rounded answers to interview questions. He had a strong education, work experience, and supervisory background. The interview panel was impressed with his answers to managing the program and ideas to improve the Pretreatment Program. He had stronger program management skills and administrative experience. Despite his lack of familiarity with our specific program, he had a better grasp of what is needed to advance the program than all other applicants, including Mr. Obi. Mr. Tait also had valuable private sector ex-

---

5. Obi received his lower scores (twos and ones on a scale of one to five) for inquiries concerning: how his formal education and work experience prepared him for this position, his experience with trouble shooting, his experience managing projects; his knowledge of federal regulations; why he should be selected; his experience in personnel management and preparation of budgets. His highest scores (fours) were in the following areas: experience in laboratory operations and water sampling and analyses; preparation of pretreatment inspections and reports; and preparation of environmental and regulatory reports. Obi's best scores occurred in the section of the interview which addressed the pretreatment portion of the Chemist position. See Questions for Chemist (PSC # 68700) Interviews, Def.'s Mot. for Summ. J., Ex. D.

6. In a follow-up letter to Wiseman, Brusnighan also stated that the position consisted only in part of pretreatment activities. The majority of the position (two thirds) involved technical and administrative support to the laboratory and project management for such things as bio-monitoring. The position announcement and personnel requisition make no mention of these tasks, but the official position description for the job details the scope of the Chemist duties. The Job Responsibilities of the Chemist include: providing guidance to water and wastewater laboratories; managing the Pretreatment Program; preparing water laboratory and pretreatment program budgets; preparing quality control and status reports; supervising North Region Water Plant Laboratory technicians and engineers; and managing other DPW regulatory programs. Position Description, Chemist, Def.'s Mot. for Summ. J., Ex. B. See also Written Findings of Maryland Commission on Human Relations, October 21, 1998, Def.'s Mot. for Summ. J., Ex. H (noting that the Chemist position included duties beyond the pretreatment area). It is not clear if the Chemist position Obi sought was identical to the one held by Hampton, or if the job duties increased. Similarly, if the duties are the same, it is not clear if Obi assisted Hampton in all her duties, or just those in the pretreatment area, as the record seems to indicate.

perience which allowed him to bring innovative ideas to the program ....

Def.'s Answer to Interrog. 6.

Defendant has carried its burden of production in articulating a legitimate nondiscriminatory reason for selecting Tait. As the Supreme Court has stated, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Burdine,* 450 U.S. at 260, 101 S.Ct. 1089. Defendant has satisfied this standard.

■ I turn, then, to the issue of whether Obi has marshaled evidence sufficient to persuade a reasonable jury that the County's explanation of his non-promotion is a pretext for unlawful discrimination. *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. Upon a plenary review of the record and of the contentions of the parties, I am not persuaded that Obi has projected evidence sufficient if believed to permit a reasonable juror to conclude that defendant's proffered reason for its rejection of Obi is pretextual.

Obi makes four arguments in his attempt to show pretext: (1) Tait was not minimally qualified and Obi was clearly the most qualified candidate; (2) defendant violated DPW policies in the selection and interview process; (3) the weight the defendant attributed to the interview stage in the selection process was impermissible; and (4) the subjective nature of the interview process, especially when coupled with the racial make-up of the interview panel, prejudiced Obi. Upon close examination, however, neither singly nor in combination do these contentions tend to show that defendant's proffered reason for selecting Tait over Obi is a pretext designed to obscure discrimination based on race or national origin.

### 1. Relative Qualifications

First, the record makes clear, and the County does not dispute, that Obi was highly qualified for the job, and in a sense was "a favorite" going in to the selection process. While it may be debatable whether defendant's selection process is the best and fairest method for evaluating qualifications of a candidate for a job, there is no indication that the process was applied any differently to Obi than to the other candidates. Obi argues that the process did not properly allow his qualifications to receive full consideration but this contention is conclusory and is not supported by any evidence. Obi is unable to point to any evidence—beyond the unfavorable outcome of the interview, which of course proves nothing by itself—that defendant's selection process operated against him invidiously because of his race or national origin. It is clear that employers can make selections from among qualified internal promotional candidates and competing external applicants for any reason so long as it is not a prohibited, discriminatory reason.

Courts have often addressed circumstances in which a plaintiff in a protected class claims a violation of Title VII because he was not hired or promoted and believes himself to be more qualified than the selectee.[7] Without some evidence that the failure to promote or hire was motivated by discrimination, a claim cannot proceed merely with the allegation of superior qualifications. *See Vaughan v. Metra-Health Companies, Inc.,* 145 F.3d 197, 202 (4th Cir.1998)(*citing Bodenheimer v. PPG*

---

7. In *Patterson,* the Supreme Court explained that a plaintiff is not required to show that she was better qualified for the position than the selectee to prove pretext. 491 U.S. at 187–88, 109 S.Ct. 2363. The Court highlighted that this was one among several forms of evidence that a plaintiff could present to show pretext. *Id.*

*Industries, Inc.,* 5 F.3d 955, 959 (5th Cir.1993))("Standing alone, self-serving claims of superiority do not suffice."); *Evans,* 80 F.3d at 960 (summary judgment granted to defendant in sex discrimination case affirmed because plaintiff "failed to show that she was more qualified for the promotion than the man selected or that, as between her sex and [the proffered] explanation, her sex was the more likely reason for her failure to be promoted").

It is true that Obi presents far more than "self-serving claims of superiority." It is uncontested that Obi possesses commendable qualifications, ample experience and a strong record of service with the County. Moreover, the County does not seem to assert that Tait was overwhelmingly better qualified for the position, but rather the situation presented is one where the top candidates possessed fairly comparable qualifications. Thus, this is not a case where the selectee's qualifications are so clearly below those of the plaintiff that defendant's proffered reason—the selectee was more qualified—can be deemed pretextual. *See Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 580, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)(affirming district court's finding plaintiff was discriminated against based on findings that plaintiff was more qualified than the selectee and that the selection committee showed bias toward the one female candidate); *Alvarado v. Bd. of Trustees of Montgomery Community College,* 928 F.2d 118 (4th Cir.1991)(affirming district court's finding that defendant's argument that selectee was more qualified was pretext when selectee for permanent janitorial position had no prior cleaning experience in contrast to plaintiff's experience in the area (plaintiff, in fact, ended up training the selectee), had been employed by defendant for a shorter period than plaintiff and in part-time capacity while plaintiff worked

full-time, and did not even apply for the position while plaintiff had filed the appropriate application).

What the court stated in *Page,* 645 F.2d 227, at 230 n. 8, is true here as well: "There is no gainsaying that [plaintiff's] qualifications, objectively assessed in relation to the successful applicant's, would have justified his selection in the exercise of a rational business judgment." That the qualifications of the candidates were so similar was cited by the *Page* court as supportive of defendants' proffered belief that the selectee was more qualified in their assessment. *Id. See also Wileman v. Frank,* 979 F.2d 30, 38 (4th Cir. 1992)("While this court may disagree with the Postal Service's determination that Wilderson and Coger were the superior candidates ... we simply cannot conclude, based upon the record, that the Postal Service's proffered justifications for preferring Wilderson and Coger over the appellee were so unworthy of credence as to support a finding of discriminatory intent.").

In this case, the focus of Obi's argument is his belief in his superior qualifications and the failure of DPW's procedures to evaluate them in a manner he thinks is equitable. In the end, "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089 (internal citations omitted).

The situation presented here is similar to that presented in *Causey v. Balog,* 929 F.Supp. 900 (D.Md.1996), *aff'd* 162 F.3d

795 (4th Cir.1998). In *Causey*, analyzed as a failure-to-promote case, the plaintiff, a deputy transit commissioner for six years and head of a division with the Department of Transportation, with a commendable performance record, was denied the position of Chief of the Bureau of Transportation (which replaced the Department of Transportation in 1992). 929 F.Supp. at 904. Defendants claimed that the selectee was more qualified for the position because of his greater administrative experience. *Id.* at 910. In addition to asserting that the defendant sought to force out older, white employees, Causey countered that his qualifications were superior to the selectee, particularly in light of his experience in the area of transportation. *Id.* Chief Judge Motz stated that "[a]lthough Causey presents an argument that he was the better candidate, courts are not to impose their own judgments for nondiscriminatory employer decisions. Absent a showing by plaintiff sufficient to raise an inference of pretext, the City is free to name an experienced [Department of Public Works] official to head the new transportation department instead of another employee with superior transportation qualifications." *Id. See also Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998)("While Causey may have been qualified to fill the [Bureau of Transportation] Chief position, this Court is not in a position to second guess executive hiring decisions that are based on legitimate, nondiscriminatory rationales such as superior administrative experience.").

Obi argues that Tait was not even minimally qualified for the position and/or that he was impermissibly certified. Obi argues that Tait's lack of qualifications exposes as pretextual defendant's claim that Tait was hired because he was more qualified than Obi. Obi's apparent goal in making this claim is to show that because defendant selected someone who was not even minimally qualified for the position over an individual in a protected class who was clearly qualified, discriminatory animus must have been involved. Obi argues that Tait did not have the minimum qualifications required for the job, such as major course work in chemistry and biology. Tait's major was in environmental sciences. Obi received an undergraduate degree in chemistry and a post-graduate degree in chemical engineering.

This argument is unavailing. Defendant's personnel officers have the power "to substitute an equivalent combination of acceptable education and experience as needed for the minimum qualifications of the classification plan." Article 8, Powers and Duties of Personnel Officer, § 1–104(2), Def.'s Mot. for Summ. J., Ex. C. Anna Baran, acting personnel officer for labor and employee relations, reviewed applications for the Chemist position and was charged with certifying a list of eligible candidates. Baran stated that she compiles the list by comparing an applicant's application with the criteria set forth in the position description. Baran Dep. at 51. She stated that it was standard procedure for her to seek guidance from the designated subject matter expert for the area the position covers, when technical questions and issues of equivalent experience and training arose. Hampton was the designated subject matter expert for the Chemist job. Baran stated that she did not specifically remember speaking with Hampton about Tait's application, but speculates that she did. *Id.* at 53. It is not clear if inquiries are made to the subject matter expert without referencing an applicant's name. Baran states that she reached the conclusion, probably after consulting with Hampton, that a major in environmental science would encompass the chemistry and biology experience re-

quired by the position description. *Id.* at 55.

Tait testified that his environmental science major consisted of his taking two or three courses in chemistry and four or five courses related to biology, and that the more advanced portion of his program included courses such as air and water quality and hazardous waste. Tait Dep. at 51–52. Baran also concluded that Tait's experience included two or more years work in water and waste water chemistry. *Id.* at 56. Tait testified that he had experience in chemical sampling of over sixteen years and chemical analysis, off and on, for over five years. Tait Dep. at 60–61. Tait stated that while he did not have direct experience in the pre-treatment area as it is defined by the EPA, he did "priority pollutant sampling for industries" to make sure they were in compliance with regulations and to help them achieve compliance if necessary. Tait Dep. at 62–63. The evidence of Tait's qualifications is unrebutted.

Finally, Baran stated that it was she who certified the list of candidates eligible for the Chemist position and that after forwarding the certification to DPW she no longer had a role in the selection. *Id.* at 90. Baran described her duties in the certification process as consisting of a "paper review." Thus, it does not appear that she met any of the candidates or that she was aware of any candidate's race or national origin. Accordingly, the record shows that Tait was qualified for the position and that no manifest error was committed by the certifying official. Indeed, the ranking in the certification process— Tait received a 55 and Obi a 89—demonstrated the range of experience and qualifications of the candidates. Hence, no inference of discrimination arises from Tait's presence in the pool of eligible candidates.

Furthermore, while the professional experience of Tait and Obi differs somewhat, the record compels the conclusion that both were qualified individuals who possessed various strengths that an employer would find valuable. Obi has a strong educational background, which includes post-graduate work as well as involvement in continuing education courses. Obi worked in the Pretreatment Program for over seven years and had clear knowledge of the workings of the program and DPW. In this role, Obi, among other things, prepared regulatory reports for the State, took enforcement actions, and prepared waste water discharge permits. Obi also performed the County's Local Pollutant Discharge Limits Study. As stated above, Hampton consistently gave Obi positive performance reviews. Although Obi did not have significant supervisory experience, he did complete several continuing education classes in management and supervision.

While Tait did not have direct experience in the pretreatment field, he appears to have more varied experience in the environmental regulatory field, which did include waste water chemistry and monitoring. In performing environmental assessments for industry and government, Tait performed environmental sampling, wrote reports, prepared permit applications, and made recommendations regarding compliance measures. Tait appears to have more recent and extensive supervisory and project management experience than Obi, as well as experience in financial and budgetary management. Tait also had experience working in the public sector and with industry. Thus, it is clear that both Tait and Obi were fully qualified for the Chemist position, and that there is no great discrepancy in qualifications that might show the County's proffered reason for Tait's selection to be pretextual.

2. Violation of DPW Policy

Next, Obi presents several arguments to support his claim that the selection process

was flawed because defendants did not follow what Obi characterizes as its own policies.

Obi first argues that the initial selection process was flawed because defendant should have advertised the job only internally rather than both internally and externally. While this may have been Obi's preference, it does nothing to show that the selection process was tainted by discriminatory animus. Baran stated that Bonk had the discretion to advertise the position internally or externally. *Id.* at 15. DPW policy did not mandate a particular approach. Bonk claims that he advertised externally to a get a wider selection of candidates and remarked that advertising externally in no. way precluded him from getting an excellent internal candidate. Bonk Dep. at 15.

Obi argues that defendant failed to follow its policy to promote from within and to select the most qualified candidate when they did not select him for the Chemist job. Obi cites a section of the DPW Policy and Procedure Manual addressing Equal Employment Opportunity to support this claim. It states that DPW formally adopts the following policies:

> (1)"[i]t is the objective of the Department of Public Works to hire individuals who are qualified for positions of employment by virtue of job-related standards of education, training, and experience;" and (2) "to promote from within whenever possible from lists certified by the County Office of Personnel those individuals qualified to fill job vacancies or positions. The Department will promote from within wherever possible and will select on the basis of merit the employee best qualified to fill a job vacancy or a new position. Applicants will be considered for a promotion on the strength of many factors, including job knowledge, job skills, job experience,

record of accomplishment, leadership potential and seniority."

Pl's Opp. to Def.'s Mot. for Summ. J., Ex. 2.

To the degree that "promoting from within whenever possible" is a DPW policy, defendant's failure to promote Obi, the only internal candidate, does not necessarily implicate Title VII, unless it can be shown that the policy was implemented differentially based on a prohibited classification. *See Vaughan,* 145 F.3d at 203 ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent .... Federal courts cannot ensure that business decisions are always informed or even methodical.") (citations and internal quotations omitted). Obi presents no evidence that indicates that this somewhat vague aspirational "policy" was not fully implemented because of his race or national origin. Thus, the fact that the only internal candidate was not promoted does nothing to show that race or national origin were considered in the selection process or that defendant's proffered reason for the selection of Tait was pretextual.

### 3. Relative Weight of the Two Stages in the Selection Process

Obi complains that his ranking in the stage one, certification process, which he deems to represent a more objective evaluation, was not given sufficient weight in the selection process, and that the interview portion was impermissibly allowed to predominate the promotion decision. While Obi outscored Tait by 34 points in the certification portion of the selection process, Tait received only four more points than Obi in the interview portion of the selection process. Obi contends that this procedure violates DPW's above mentioned "policy" to hire those "qualified for

positions of employment by virtue of job-related standards of education, training, and experience." This "policy" does not prohibit the DPW from using different methods of determining who is the best-qualified applicant for a vacancy, including an interview. Defendant asserts that the selection process used here is the DPW's standard hiring and promoting procedure. *See* Def.'s Answer to Interrog. 6 ("This process is in conformance with all interview processes used by the Department of Public Works."). It must be remembered that the court has "no authority simply to require employers to use the 'best' standards and procedures available to them" in selecting employees. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989). All candidates went through the certification and interview process. Obi does not contend that he was treated any differently than other candidates in this respect, and no inference of discrimination based on race or national origin reasonably arises on this record.

4. Subjective Nature of the Selection Process and the Racial Make-up of the Interview Panel

Next, Obi argues that the interview process was fatally flawed by its subjective nature. At the interview, all interviewees were asked the same questions. The questions were developed by Hampton, reviewed by Bonk and approved by the personnel department before they were used. Bonk Dep. at 49. Defendant contends that Tait was selected because he "interviewed well," but also because he was best able to explain how his qualifications were suited for the job and how he would actually perform the job. The record reveals that Tait's selection was not based on the use of purely subjective criteria. According to defendant, Tait was chosen "based on his answers and his level of detail on how he would manage the program and so forth

all coupled together as part of the interview questions ...." Bonk Dep. at 54.

Bonk notes that Tait had more supervisory and management experience than Obi. Indeed, Bonk states that he was disappointed with Obi's interview and that Obi was "totally unprepared." *Id.* at 41. "He failed to communicate to the panel what he would do in his own right to bring this program to the next level" and that "he was not willing to communicate to the panel as to what his abilities and skills were." *Id.* at 41, 42. "[Obi] didn't expound when prompted to my satisfaction on what he would do to move the program forward." *Id.* at 44. Bonk testified that he even asked Obi additional questions at the close of the interview to give him the opportunity to improve his interview performance as he felt he had done poorly. *Id.* Bonk saw it as an "opportunity [for Obi] to augment his ratings" that he gave Obi and no other candidate. *Id.* at 45.

Obi argues that undue weight was given to the interview portion of the selection process and that the subjective nature of the process put him at a disadvantage. "[T]he mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it such sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case." *Page*, 645 F.2d at 230 (*citing McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. 1817). However, "when the evaluation is to any degree subjective and when the evaluators are themselves not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge." *Id.* This is because "subjective decision making provides an opportunity for unlawful discrimination." *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir.1981).

I have subjected defendant's showing here to "close scrutiny." I am persuaded that, while subjective judgments were necessarily involved in the interview process, Obi does not offer evidence that shows that the interview process was conducted in a way that indicated it was infected with discriminatory motives.[8] As discussed above, the interview consisted of 17 detailed questions regarding the following areas: (1) general experience; (2) laboratory; (3) pretreatment and environmental experience; (4) project management experience; and (5) administrative and personnel experience. While defendant references Tait's confidence and good presentation as traits which benefitted him at the interview, it also cites his supervisory and management experience, which were elaborated upon in the interview.

Further, the scores of the top three candidates after the interview process were closely clustered: 52, 50 and 48. Set forth below is a summary of the scores given by each interviewer to the certified applicants:

| Applicant: | D. Obi | L. Ramallosa | B. George | C. Tait | J. Demsky |
|---|---|---|---|---|---|
| Interviewer | | | | | |
| M. Bonk | 46 | 21 | 52 | 52 | 21 |
| P. Lesher | 42 | 32 | 48 | 45 | 25 |
| J. Hampton | 55 | 24 | 51 | 58 | 22 |
| Total | 143 | 77 | 151 | 155 | 68 |
| Average | 48 | 26 | 50 | 52 | 23 |

Def.'s Rep. Mem., Ex. 6D. While Tait achieved the highest score, there is no dramatic discrepancy between his performance and that of Obi and the second highest rated candidate to indicate that the interview process served as a subterfuge for a discriminatory hiring process. The scores given by each interviewer to the candidates display no discernible pattern suggestive of discriminatory animus.

Finally, Obi attempts to show that defendant's proffered reason for Tait's selection is pretextual by attacking the racial makeup and composition of the interview panel. All members of the interview panel were white and U.S.-born. The County argues that Hampton was selected to serve on the panel because she was the incumbent and had the most knowledge of the job. Further, defendant states that Bonk was chosen because he would be supervising the successful candidate. Lesher was chosen because his position included monitoring industry in an area which discharged the bulk of substances that concerned the County's Pretreatment Program. Obi argues that an African–American male, Kenneth McCall, who worked in close proximity to the Pretreatment Program and who was familiar with Obi's work and the general pretreatment area, should have sat on the interview panel. To be sure, assignment of McCall to serve on the panel may well have been a more appropriate choice than Lesher. Nevertheless, this missed opportunity by the County to craft a process that was

---

8. It should be noted that initially Obi claimed that Tait was hired as a result of "favoritism" or "nepotism," on the theory that Hampton was an acquaintance of Tait's wife. Obi apparently has abandoned this claim as "irrelevant." Pl's Opp. to Def.'s Mot. for Summ. J. ¶ 24. I note that the Fourth Circuit has stated that favoritism toward friends and relatives is not a violation of Title VII without a showing that the employment action involved an impermissible consideration of a classification explicitly enumerated in Title VII. *Holder v. City of Raleigh,* 867 F.2d 823, 825–26 (4th Cir.1989).

more sensitive to appearances does not translate into a showing that defendant's articulated reason for selecting Tait is pretextual.

Nor would the fact that the interview panel was all white—by itself—permit a reasonable juror to infer that race and/or national origin played an impermissible role in the selection process. One suspects that most human resources professionals would counsel the County that a more diverse interview panel would have been a better approach and would have communicated a more enlightened human resources policy. Nevertheless, there is no indication that the racial makeup of the panel played a role in Obi's non-selection, or that it resulted in clearly favorable evaluations for all the white candidates. A juror who drew the inference urged by Obi here would be engaged in speculation.

Obi also argues that the placement on the panel of Hampton, his supervisor of seven years, prejudiced him. He argues that he did not feel he could give the panel complete answers for fear that his remarks might be considered by Hampton as criticism of her job performance. This contention is not without force. One can readily understand the awkwardness of being interviewed (in a highly competitive environment) by a long-time supervisor to become her replacement. Defendant responds that the panel made efforts to phrase questions in ways that addressed how the program could best be carried forward rather than evaluating its present status.

In any event, the inherent awkwardness in the arrangement utilized by defendant does not tend to show that defendant's reasons for assessing Tait as more quali-

fied were pretexts for discriminatory animus. One could as easily argue that Obi *benefitted* from Hampton's presence, in ways the other candidates did not, because she knew his qualifications and had consistently considered him a good employee. Indeed, while Hampton, in the end, scored Tait three points higher on his interview performance than she scored Obi, she gave Obi the highest score of all three interviewers. Obi's argument reduces to a contention that without Hampton's presence on the interview panel, he would have achieved a marginal increase in his average score. In the light of the actual scores of the panel, however, this contention is seriously flawed and must be rejected; it provides no support for Obi's contention that the record affords a basis for a jury to conclude that defendant's reason for Tait's selection and Obi's non-selection is pretextual.

\* \* \* \* \* \*

In sum, defendant has carried its burden of production to articulate a legitimate nondiscriminatory reason for hiring Tait, rather than promoting Obi, to fill the Chemist position. Because Obi has failed to project evidence on which a reasonable jury could reasonably find that defendant's ostensible nondiscriminatory reason for failing to promote Obi is pretextual and that the real reason for Obi's non-promotion was unlawful discrimination, summary judgment must be granted to the defendant on this claim.

## B. Retaliation Claim [9]

Obi next alleges that he was retaliated against for filing the failure-to-promote

---

**9.** Plaintiff asserts that he need not address the retaliation claim because the County "ha[s] not moved for summary judgment" on that claim. Pl's Opp. to Def.'s Mot. for Summ. J. at 16. Defendant moved for summary judg-

ment on *"all issues in this cause of action."* In addition, the defendant did address the retaliation claim in Bonk's Declaration, which is attached to its Motion for Summary Judgment. As plaintiff well knows, he carries the

claim. Preliminarily, defendant moved to dismiss this claim on the ground that a Right–to–Sue notice was issued to Obi prematurely and thus this court may not exercise jurisdiction over this claim. Obi filed a charge of retaliation with the EEOC on March 20, 2000. He requested, and received, a Right–to–Sue notice on April 20, 2000, 31 days after the complaint was filed. Obi had received a Right–to–Sue notice on his failure-to-promote claim on October 14, 1999.

While the Fourth Circuit has not directly addressed the validity of the EEOC's practice of issuing right to sue letters prior to the passage of 180 days, my colleagues on this court have reached conflicting conclusions. *See Loney v. Carr–Lowrey Glass Co.*, 458 F.Supp. 1080 (D.Md.1978) (claim remanded to the EEOC because Right–to–Sue notice was issued before the passage of 180 days); *but see Thomas v. Bet Sound–Stage Restaurant/BrettCo, Inc.*, 61 F.Supp.2d 448, 459 (D.Md.1999)(issuance of Right–to–Sue notice prior to the passage of 180 days did not bar the court's exercise of jurisdiction). In any event, because the disputed claim here involves alleged retaliation arising out of a validly processed substantive charge, I need not enter this debate. That is, the Fourth Circuit has held that "a plaintiff may raise the retaliation claim for the first time in federal court." *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992)("We believe that rule is the inevitable corollary of our generally accepted principle that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commis-

sion.")(internal quotation marks and citations omitted).

■ To establish a *prima facie* case of retaliation a plaintiff must show that (1) he engaged in protected activity; (2) defendants took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Beall v. Abbott Lab.*, 130 F.3d 614, 619 (4th Cir.1997). The defendant may then rebut the *prima facie* case by showing that there was a legitimate nondiscriminatory reason for the adverse action. *See Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 242 (4th Cir.1997). The burden then shifts back to the plaintiff to show that those reasons are pretextual. *Id.*

The "employment discrimination laws require as an absolute precondition to suit that some *adverse employment action* have occurred." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (emphasis added). In defining what constitutes an adverse employment action, the Fourth Circuit observed in *Page*, 645 F.2d at 233, that inquiries into whether there has been an employment action adversely affecting an employee have "consistently focused on the question whether there has been discrimination in what could be characterized as *ultimate employment decisions* such as hiring, granting leave, discharging, promoting and compensation." (emphasis added). *See also Hopkins v. Baltimore Gas & Elec. Co.*, 871 F.Supp. 822, 836 (D.Md. 1994), *aff'd*, 77 F.3d 745 (4th Cir.1996); *Lucas v. Cheney*, 821 F.Supp. 374, 375 (D.Md.1992), *aff'd*, 991 F.2d 790, 1993 WL 120483 (4th Cir.1993). The Fourth Circuit further stated:

---

burden of showing that genuine issues of material fact exist with respect to each claim for which defendant moves for summary judg-

ment. Plaintiff engaged in no discussion of the retaliation claim, but because it is validly before the court I must address it.

Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered, for example, entry into training programs. By the same token, it is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscription of § 717 and comparable provisions of Title VII.

*Page*, 645 F.2d at 233 (citation omitted).

Recently, the Fourth Circuit has clarified, in a retaliatory harassment case under Title VII, that an adverse employment action includes, but is not limited to, "ultimate employment decisions." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001)(" '[U]ltimate employment decision' is not the standard in this circuit."). The proper focus of the analysis is on whether the action adversely affects a term and condition of employment. An objective test of "adversity" applies, and a plaintiff's subjective feelings about the employment action is a necessary, but not a sufficient, evidentiary showing to withstand summary judgment. *See Goldberg*, 836 F.2d at 848.

■ Obi contends that he was retaliated against in that: (1) he was forced to keep a log of his phone calls; (2) he was "placed in an inferior office setting inconsistent with his seniority and job status;" and (3) he was denied a merit pay increase. Pl's Opp. to Def.'s Mot. for Summ. J. ¶ 20. These contentions are fatally undermined by the summary judgment record, however, which demonstrates, as explicated below, that Obi's retaliation claim fails as a matter of law.

First, Obi claims that he was retaliated against when he was forced to keep a log of his telephone calls at work. It simply is not tenable to contend that being asked to keep a log of telephone calls made at one's place of employment is an adverse employment action that changed the terms and conditions of Obi's employment. There is no indication that Obi was disciplined for excessive telephone use or that he was singled out to account for his phone activity. Tait appears to have instituted a policy of having employees under his supervision log their phone calls after he noticed what he believed to be excessive phone use "on the second floor and over a several month period." Obi has not presented any evidence that having to log his phone calls materially affected his duties or responsibilities.

Next, Obi contends a change in his office arrangements was retaliatory. The record indicates that at some point prior to September 30, 2000, the Pretreatment Program moved into new office space. It is not clear if Obi had a private office prior to the move. After the move, he shared an office with a co-worker assigned to similar duties, Peter Steps. Tait asserts that, months before the move, Obi was given drawings of the new office space and an opportunity to lay out the space as he desired and opportunity to visit that space. Apparently, Steps and Obi did layout the space to which they were to move. Tait states that not until the day before the move did Obi complain about the space.

Thus, defendant argues, Obi did not visit the office space until the day before the move even though he had several months to do so, and that when Obi inquired about space on the other side of the building that may be vacant, Tait informed him that the space Obi referred to was not a portion of the Pretreatment Program. Obi was invited to make further inquiries of Bonk.

In any event, the evidence of record does not support a finding that Obi's office assignment after the move constitutes an adverse employment action. *Id.* While Obi may feel inconvenienced or cramped by this new assignment, it appears that his office assignment was part of a departmental move and that Obi was given an opportunity to design his work space, and had time to visit the space to evaluate if it met his work needs. There is no indication that his office assignment was made in retaliation for his filing of a discrimination charge or that it was carried out in a manner different from the manner it would have been as to an individual who had not engaged in any protected activity.

Finally, Obi asserts that he was denied a pay increase. Denial of a pay increase would obviously constitute a "materially adverse employment action." No evidence has been presented, however, to indicate that Obi's performance pay was calculated any differently than was the performance pay of similarly situated employees who did not engage in protected activity. It is also true that neither party has provided the court any guidance in understanding how performance pay increases are calculated and if raises are given under conditions apart from performance. In short, the record presents inconsistencies and confusion with respect to the calculation of raises, but no indication that Obi's pay was calculated in a different way than similarly situated employees outside of the protected class.

The record indicates that Obi's salary has been increased based on merit fairly regularly from 1996 until the present. The record, while unclear, indicates that Obi did not receive a performance pay increase in 1999.[10] There is no Personnel Action Authorization indicating a raise for the year of 1999 with the relevant Performance Evaluation in the record. For 1997 and 1998, the record consists of Personnel Action Authorizations indicating pay increases appended to the Performance Evaluations. The merit increases that Obi has received have ranged from .5% to 3%.

The rules regarding the terms of merit pay increases have not been presented in the record as clearly as they could have been presented, but the record permits a fair evaluation of this claim. It appears that merit pay increases are determined by performance ratings, but also by the grade held by the employee. Bonk asserts that "probably 80 percent of our employees who are at maximum grade which doesn't entitle them to a merit increase unless they get a level 1 ... out of the people that were eligible for an increase, 25 percent probably did not." Bonk Dep. at 129–30.

In October 1997, Obi received a performance pay increase of 3%. In his performance evaluation ending June 1997, Obi received an overall rating of 2, on a rating scale of 1 to 3, three being the lowest.[11] This evaluation was signed by Hampton and Bonk. Obi received 31% ones and 69% twos in the evaluation to achieve an overall score of 2. In November 1998, Obi received

---

10. The record consists of a statement that Obi received a 3% salary increase in 1999, Bonk Decl. ¶ 8, as well as a statement that Obi was not eligible for a pay raise in 1999 because his performance evaluation was not high enough. Def.'s Answer to Interrog. 20. Assuming the facts in the light most favorable to Obi, I assume he did not receive a merit pay raise in 1999.

11. An overall rating is arrived at by calculating the number of ones, twos, and threes an employee has received in all the areas evaluated. General work skills as well as the performance of specific job duties are evaluated.

a performance pay increase of only .5 %. In his evaluation ending June 1998, his overall rating was 2. Again, he received 31% ones and 69% twos. This evaluation and all subsequent evaluations were signed by Tait and Bonk.

At the end of 1999, Obi received an overall rating of 2, with 29% ones, 65% twos, and 5% threes (in productivity). He apparently did not receive a pay increase for this year because of the higher percentage of twos and threes on the Performance Evaluation than previously received. Obi signed this evaluation and does not appear to have disputed its contents. Bonk states that Obi received a 2% performance pay increase in 2000 and a 3% increase in 2001. Bonk Decl. ¶ 8. In addition, in 1996, before Obi had filed a discrimination charge, he was awarded a 3% performance pay increase. *Id.* Thus, while the record is not clear on the precise procedure for calculating performance pay increases, no great discrepancies are noted in the post-charge-filing period that would indicate that Obi was being penalized for such protected activity. Further, while Obi indicates on his 1998 performance review that he did not agree with Tait's assessment, the 1998 evaluation is fairly consistent with the other evaluations presented in the record.

In addition, defendant has presented evidence showing that a similarly situated individual, who apparently has filed no discrimination charges, received performance pay increases similar to or below Obi's for similar performance evaluations. Peter Steps performed tasks similar to Obi. Tait Dep. at 69. Steps is a white male. There is no indication that Steps has engaged in protected activity. His grade is the same as Obi's, although his title is different. Steps and Obi perform the same monitor-ing and permitting duties. Tait Dep. at 69. In 1998, Steps received a performance pay increase of .5 % with an overall rating of 2 (31% ones and 69% twos). Thus his pay increase and percentage of ones and twos on the evaluation were identical to those received by Obi in 1998. In 1999, Steps received a performance pay increase of 1.5% with an overall rating of 2 (41% ones and 59% twos). While Steps received a pay increase in this year and Obi did not, it appears that Steps received a more favorable Performance Evaluation than Obi. This unrebutted evidence tends to show that performance pay increases were awarded to Obi in a wholly non-discriminatory and non-retaliatory fashion.

Moreover, it also appears that Tait was awarded performance pay increases in a manner not inconsistent with the process applicable to Obi and Steps. In 1998, Tait, whose position holds a grade 17, received a performance pay increase of 3.5% with an overall rating of 2 (67% ones and 23% twos).[12] In 1999, Tait received a performance pay increase of 3% with an overall rating of 2 (71% ones and 29% twos).

In sum, there is no indication that Obi's performance pay increases are out of step with individuals who did not engage in protected activity. Even were I persuaded that Obi had established a *prima facie* case on this portion of the retaliation claim, therefore, Obi does not present sufficient evidence to permit a reasonable jury to find that the reasons for the level of his merit pay increases—apparently, they are driven by performance ratings—are concocted to hide a retaliatory motive.

## IV. CONCLUSION

For the reasons set forth herein, the motion for summary judgment shall be granted. An Order follows.

---

**12.** Although the performance evaluation states 23% of Tait's scores are twos, the correct calculation is 33%: eight out of 24 of his ratings were twos.

## ORDER

In accordance with the foregoing Memorandum, it is this 1st day of May, 2001, by the United States District Court for the District of Maryland, ORDERED

(1) That the motion for summary judgment is GRANTED AND JUDGMENT IS ENTERED IN FAVOR OF ALL DEFENDANTS AGAINST PLAINTIFF; and

(2) That the Clerk CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.